**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES,**<br><br>        **v.**<br><br>**JAMAL A. ADAMS**, a/k/a Ishmael Heru-Bey,<br><br>        **Defendant.** | **Criminal Action No. 15-44 (JEB)** |

## MEMORANDUM OPINION

Defendant Ishmael Heru-Bey, formerly Jamal Adams, was convicted by a jury in October 2015 of corruptly endeavoring to obstruct and impede the internal-revenue laws. This Court sentenced him in April 2016 to eleven months' incarceration, followed by twelve months of supervised release, and ordered him to pay restitution of $45,712. He now moves for release pending his appeal of this conviction on the ground that such appeal raises at least one substantial question of law or fact likely to result in an appellate decision in his favor. More specifically, Heru-Bey argues that this Court erred in holding that: (1) he had forfeited his right to request a jury instruction concerning unanimity; (2) such a unanimity instruction is not required as a matter of law in his case; and (3) the government did not violate Batson v. Kentucky, 476 U.S. 79 (1986), through its use of peremptory strikes of black jurors during *voir dire*. Because none of these challenges meets the required threshold, the Court will deny his Motion.

## I.    Background

Defendant was charged in a Superseding Indictment filed on August 19, 2015. See ECF No. 17. (Because Heru-Bey legally changed his name from Jamal Adams only after many of the

relevant acts had occurred, the Indictment refers to him as Adams.  Given that his name is now

Heru-Bey, that is what the Court will call him.)  The Indictment charged Defendant with one

count of corruptly endeavoring to obstruct and impede the internal-revenue laws by various

means – including the submission of false income-tax documents to his employer, the IRS, and a

federal bankruptcy court – in violation of 26 U.S.C. § 7212(a), and two counts of attempting to

evade or defeat taxes, in violation of 26 U.S.C. § 7201.  Id. at 2-5.  The case proceeded to trial on

October 5, 2015, and a jury ultimately convicted him of the first charge and acquitted him of the

latter two.  See ECF No. 38.

Following his conviction, Defendant filed a motion for a new trial on the ground that the

Court had improperly responded to a jury note during deliberations.  See United States v. Adams,

150 F. Supp. 3d 32, 33-34 (D.D.C. 2015).  Specifically, Heru-Bey argued that the Court should

have instructed the jury that it had to unanimously agree on at least one of the specific means by

which he had acted to obstruct or impede the internal-revenue laws.  Id.  The Court denied this

motion both because Defendant had not sought such an instruction during the charge conference

and because one would not have been legally correct.  Id.  The Court then sentenced him on

April 14, 2016, to eleven months' incarceration, followed by one year of supervised release, and

ordered him to surrender himself to the Bureau of Prisons upon subsequent notification.  See

ECF No. 57.

On April 28, 2016, Defendant filed a Notice of Appeal.  See ECF No. 59.  Following up,

he has now filed a Motion for Release Pending Direct Appeal under 18 U.S.C. § 3143(b).  The

government opposes his request.  The Court, meanwhile, has held his prison reporting in

abeyance pending determination of this Motion.  See Minute Order of April 26, 2016.

## II.     Legal Standard

Under 18 U.S.C. § 3143(b)(1), the Court must detain a defendant pending appeal unless it finds: (A) by clear and convincing evidence that he is not likely to flee or pose a danger to the safety of any other person or the community if released; (B) that the appeal is not for the purpose of delay; and (C) that the appeal raises a substantial question of law or fact likely to result in: (i) reversal, (ii) an order for a new trial, (iii) a sentence that does not include a term of imprisonment, or (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.  Because the government does not dispute that Heru-Bey has satisfied subsections (A) and (B), the sole question here relates to subsection (C).

An analysis of that subsection is generally construed as a dual inquiry: (1) Does the appeal raise a substantial question of law or fact? (2) If so, would the resolution of that question in Defendant's favor be likely to lead to any of the results listed above?  See United States v. Perholtz, 836 F.2d 554, 555 (D.C. Cir. 1988) (per curiam).  As the government concedes the second prong, the Court's focus is on the first.

In determining whether Defendant has raised a substantial question, the Court keeps in mind that there is a presumption of a valid conviction when assessing motions for release pending direct appeal.  See id. at 556.  Defendant bears the burden of rebutting this presumption. United States v. Libby, 498 F. Supp. 2d 1, 3 (D.D.C. 2007); see also United States v. Shoffner, 791 F.2d 586, 589 (7th Cir. 1986) (finding defendant must "demonstrate that he has a substantial question to present [on appeal] before he may be admitted to bail").  To determine whether a substantial question exists, the Court must inquire whether the defendant has raised an issue that is "a close question or one that very well could have been decided the other way."  Perholtz, 836

3

F.2d at 555 (finding that "close question" standard is "more demanding" than one that requires the inquiry to be "fairly debatable," "fairly doubtful," or simply "not frivolous").

III.    **Analysis**

In seeking his release, Defendant asserts that his appeal will raise three substantial questions of court error that are likely to result in a new trial.  See Mot. at 2-3.  These questions are (1) whether he forfeited his right to request a means-unanimity jury instruction; (2) whether unanimity within means is required as a matter of substantive or constitutional law for a § 7212(a) conviction; and (3) whether the government violated Batson during *voir dire* through its use of peremptory strikes.  Id.  Although the Court recognizes that it is far from infallible, it believes that it appropriately disposed of these three issues and that Defendant's challenges are insufficient to warrant release.  It considers each in turn.

A.  Forfeiture of Right to Jury Instruction

Defendant first contends that whether he forfeited his right to a means-unanimity jury instruction – that is, a directive that all jurors must agree on which specific means (or acts) he took to obstruct or impede the internal-revenue laws – constitutes a substantial question.  See Mot. 2-3.  During the charge conference, Defendant concededly did not seek such an instruction. Adams, 150 F. Supp. 3d at 35.  Yet when the jury sent out a note during deliberations relating to the first count, Heru-Bey then requested that the Court include a means-unanimity directive in its response.  Id.  The Court refused, ruling in part that Defendant had forfeited his right to request such an instruction by failing to do so at the charge conference.  Id. at 35-36 (although the Court and parties initially termed this failure a "waiver," the Court noted in its ruling on Defendant's motion for a new trial that "it actually appears to be [a question] of forfeiture").  The Court also emphasized during this mid-deliberations colloquy that the note did not specifically raise the

unanimity issue; as a result, including such an instruction in its response would be inappropriate. Id.  Finally, as will be discussed below, the Court explained at trial that such a unanimity instruction would be legally incorrect.  Id.

The Court considered the forfeiture question for a second time in response to Defendant's motion for a new trial.  See id. at 36-37.  Heru-Bey there maintained that, although he "did not object to [the jury] instructions" at the close of evidence, he did not forfeit his right to ask for a means-unanimity instruction because he timely requested one during arguments on how the Court should respond to the jury note.  See Motion for New Trial at 2, 4-5.  In other words, Defendant believed that the jury note presented him with a "second bite at the apple," Adams, 150 F. Supp. 3d at 37, and that his timely request in response to that note vitiated his silence at the charge conference.  The Court rejected Defendant's argument on the same grounds that it relied on at trial – namely, because Defendant had forfeited his right to such instruction by never asking for it before the jury retired to deliberate, as required under Federal Rule of Criminal Procedure 30(d), and because the aforementioned jury note had "never actually posed the unanimity question" and thus did not present the "second bite" Defendant sought.  Id. at 36-37 (quoting Fed. R. Crim. P. 30(d)); see also United States v. Hernandez, 146 F.3d 30, 35 (1st Cir. 1998) ("A party's failure properly to preserve an objection to a jury instruction contained in the original charge forfeits the point, and the defaulting party cannot resuscitate [that] point by objecting to the Court's later repetition of the same instruction in response to a jury question."); United States v. Ladd, 885 F.2d 954, 961 (1st Cir. 1989) (stating that "trial court should confine its response to the approximate boundaries of the jury's inquiry").

In his current Motion, Defendant offers no new arguments, and the Court's findings and reasoning thus remain the same.  Yet even if this forfeiture issue did present a substantial

question, Defendant's appeal would not result in a new trial unless a means-unanimity

instruction was actually appropriate.   As explained previously in response to Defendant's

motion for a new trial and again below, that is not the case.

B.  Unanimity Within Means

Defendant's second contention is that whether "unanimity is . . . required as a matter of

substantive or constitutional law" is a substantial question.  See Mot. at 2-3.  As with the

forfeiture question, Heru-Bey also previously raised this issue in his motion for a new trial.  See

Adams, 150 F. Supp. 3d at 37-38.  In that motion, he supported his position with "an unpublished

opinion from the Tenth Circuit, United States v. Wood, 384 Fed. App'x 698 (10th Cir. 2010), in

which the district court did give a unanimity instruction [where] the defendant was similarly

charged with corruptly endeavoring to obstruct and impede the internal-revenue laws."  Id. at 37.

This Court, however, ruled that Wood did not provide a basis for granting a new trial because the

Tenth Circuit "never offered any opinion on [the] legal propriety" of the instruction in Wood and

later found – in a different case – that "a unanimity instruction is improper in relation to the

count on which Heru-Bey was convicted."  Id. (citing Wood, 384 Fed. App'x at 708, and United

States v. Sorensen, 801 F.3d 1217, 1235, 1237 (10th Cir. 2015)).  The Court also pointed out that

the Supreme Court and other circuits have generally held that juries must be unanimous about

the elements of offenses, but not the means by which defendant's actions satisfy those elements.

Id. (citing Richardson v. United States, 526 U.S. 813, 817 (1999) ("[A] federal jury need not

always decide unanimously which of several possible sets of underlying brute facts make up a

particular element, say, which of several possible means the defendant used to commit an

element of a crime."); United States v. Daniel, 749 F.3d 608, 614 (7th Cir. 2014) (upholding

district court's denial of request by defendant charged with scheme to defraud for unanimity

instruction regarding specific fraudulent representations because such representations "were merely the means he used to commit an element of the crime"); United States v. Davis, 306 F.3d 398, 414 (6th Cir. 2002) ("[A]lthough there may have been various means by which Defendant aided and abetted in the underlying offenses for which he was convicted, no unanimity instruction with regard to these various means was necessary.")); see also Schad v. Arizona, 501 U.S. 624, 626 (1991) (Scalia, J, concurring) ("[I]t has long been the general rule that when a single crime can be committed in various ways, jurors need not agree on the mode of commission.").

Defendant presents only one new argument in this Motion.  He asserts that jury "unanimity" is a "fundamental concern" of the judicial system.  See Mot. at 3-4 & n.3.  This Court has never held otherwise, but that assertion does not answer the question of whether the jury must be unanimous in this case about both the elements of the offense and the means by which such elements are accomplished.  The uniformity of the caselaw compels the Court to find that Heru-Bey has not presented a substantial question on this issue.

C.  Batson Challenge

Defendant last maintains that his appellate challenge to the government's use of peremptory strikes of black jurors during *voir dire* raises a substantial question.  He did not discuss this issue in his prior motion for a new trial.  The outcome is nonetheless the same as for the two issues that he did previously raise.

Under Batson, a trial court must apply a three-step process to adjudicate a claim that a peremptory challenge was based on race: "First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and

third, in light of the parties' submissions, the trial court must determine whether the defendant

has shown purposeful discrimination."  Snyder v. Louisiana, 552 U.S. 472, 476-77 (2008)

(internal quotation marks and alterations omitted).  It is worth noting that the Court at trial

expressed its concern that the government had used all seven of its strikes on black jurors.  See

Trial Tr., attached as Appendix, at 11:17-18 ("And I'm loath[] to uphold all the strikes, given that

I see that they're all black jurors.").  It reiterates here that prudent counsel typically do not even

approach the Batson *prima facie* line.

In any event, the Court at step one easily agreed that Defendant had established a *prima*

*facie* case of racial discrimination where the qualified jury pool was only 44% black – *i.e.*,

eighteen whites and fourteen blacks were qualified.  Id. at 1:7-14; see United States v. Gooch,

665 F.3d 1318, 1327 (D.C. Cir. 2012) (finding *prima facie* case supported when prosecution

"exercises a disproportionate share of its total peremptory strikes against members of a

cognizable racial group compared to the percentage of that racial group in the venire"); id. at

1327-28 (finding *prima facie* case supported where prosecution used sixteen of twenty-two

strikes on black venirepersons and qualified jury pool was only 50% black).  This was true even

though the twelve ultimately seated jurors included three black members.  See App. at 16:9-10;

see also Miller-El v. Dretke, 545 U.S. 231, 240-41 (2005) (finding *prima facie* case where one

black juror remained on jury and prosecution used ten of fourteen strikes on blacks, eliminating

91% of eligible black jurors); Johnson v. United States, 545 U.S. 162, 168 (2005) (holding that

"defendant must make out a *prima facie* case by showing that the totality of the relevant facts

gives rise to an inference of discriminatory purpose") (quoting Batson, 476, U.S. at 93-94).

The Court next required the government to justify each of its strikes and then heard

defense arguments on pretext.  "[I]n considering a Batson objection," the trial court must

consider "all of the circumstances that bear upon the issue of racial animosity."  Snyder, 552

U.S. at 477.  This may include an office's "specific policy of systematically excluding [a

particular race] from juries," Miller-El, 545 U.S. at 263, "direct comparisons between 'similarly

situated' venirepersons of different races," Coulter v. McCann, 484 F.3d 459, 465 (7th Cir. 2007)

(quoting Miller-El, 545 U.S. at 247), and the veracity and logic of the challenged party's

justifications.  Snyder, 552 U.S. at 482-483.  Here, the Court carefully examined the

government's proffered basis for striking each black juror and determined whether it was truly

race-neutral or could equally apply to white jurors in the pool who were not struck, thereby

raising an inference of race-based decisionmaking.  At no point did the Court find the

government untruthful.  For example, the Court accepted the government's explanation that one

struck juror had difficulty understanding English and thus might struggle to follow the evidence

at trial.  See App. at 4:7-5:18.  Likewise, the government reasonably concluded that another

struck juror might be biased against it because she believed her uncle had been treated unfairly

by either the police or prosecution when he was convicted in a narcotics case.  Id. at 6:17-8:5.

Arguably the closest challenge concerned Juror 0857, a black woman whom the

government struck because the father of her children was imprisoned.  Id. at 9:21-10:7.  The

government stated that it was concerned that Juror 0857 might be biased against conviction as a

result of this "family situation" because Defendant's incarceration could "impact . . . the mother

of his children who, for example, would not be getting child support."  Id. at 10:3-7.  Defendant

countered that there were white jurors who were not struck but had "cousins [who were] locked

up."  Id. at 10:23-11:2.  According to Defendant, "Presumably, those cousins had kids . . . who

would [engender] the same sympathies" in those jurors.  Id. at 11:2-4.  The Court upheld the

strike, noting the closer familial relationship.  Id. at 11:5.

Multiple courts across the country have considered the strength of jurors' relationships to different types of imprisoned family members. They have largely held that a juror may be struck on the basis of an imprisoned relative even if there is an unstruck juror of another race who also has a relation in prison, so long as the "degree of familial relation" between the struck juror and her incarcerated family member is "closer" than that between the juror who was not struck and his family member. See State v. Dominguez-Rodriguez, 471 S.W.3d 337, 347 (Mo. Ct. App. 2015) (allowing strike of black juror on basis of husband's imprisonment despite failure to strike white juror whose nephews had been incarcerated in part because "having a close family member previously incarcerated [(husband)] . . . is different than having . . . a distant relative [(nephew)] . . . go to prison"); see also Golphin v. Branker, 519 F.3d 168, 186-87 (4th Cir. 2008) (allowing strike of black juror based on father's prior imprisonment where unstruck white juror had sister and brother-in-law in prison because "the potential effect on [Juror 1] of growing up without a father because he was in the criminal justice system is bound to be different than the effect on [Juror 2] of having a ne'er-do-well sister and brother-in-law"). In other words, a juror with a close family member imprisoned is not necessarily "similarly situated" to one who has a more distant relative incarcerated. In this case, similarly, the father of the struck juror's children presents a much closer relationship than the unstruck juror(s)' cousins.

As to all strikes, the Court relied on its own notes and recollections to verify the government's statements and to assess and correct Defendant's pretext arguments. See United States v. Moore, 651 F.3d 30, 41 (D.C. Cir. 2011) (approving of district court "question[ing] counsel, review[ing] its own notes, and correct[ing] mistakes by counsel" before "conclud[ing], based on the arguments and its personal observation of the prosecutors and of the prospective

jurors' demeanor, that the government's race-neutral explanations were genuine").  It ultimately found that all the strikes were not based on race.  <u>See</u> App. at 11:21-22.

Although the government undoubtedly acts at its peril when it engages in such wholesale striking of jurors belonging to a particular group, the Court believes that no substantial question of a <u>Batson</u> violation exists here.  <u>See</u> <u>United States v. Clark</u>, 747 F.3d 890, 894-95 (D.C. Cir. 2014) (affirming district court's denial of <u>Batson</u> challenge when defendant could not show that strike justifications were necessarily inconsistent and therefore pretextual, and "comparative analysis provide[d] no 'unmistakable' evidence of the government's discriminatory intent") (quoting <u>Gooch</u>, 665 F.3d at 1332); <u>Gooch</u>, 665 F.3d at 1334 (rejecting <u>Batson</u> challenges because "the [g]overnment offer[ed] race-neutral reasons for [each] peremptory strike, and the defendant [could not] carry the burden of showing . . . discriminatory intent"); <u>Moore</u>, 651 F.3d at 44 (denying <u>Batson</u> challenge because defendant "failed to sufficiently undermine the government's race-neutral explanations" and thereby failed to show that they were pretextual).

## IV.    Conclusion

Because the Court concludes that none of the issues presented by Defendant constitutes a substantial question of law or fact, it will deny his Motion for Release Pending Direct Appeal. An accompanying Order will so state.

/s/ <i>James E. Boasberg</i>
JAMES E. BOASBERG
United States District Judge

Date: <u>August 4, 2016</u>

1   10-5-15 Batson challenge discussion - USA v. JAMAL ADAMS.

2          THE COURT:  Let me have counsel approach.

3          (Bench conference)

4          MR. GARDNER:  Your Honor, at this point, the

5   defense would make a Batson challenge.  The prosecution

6   has struck entirely African-Americans from the jury.

7          THE COURT:  Let me take a look.  Of the six the

8   government strikes, all six are black jurors.

9   Statistically, of the qualified jurors, there were 14

10  black jurors, 18 white jurors, black jurors are 44

11  percent of the venire and they constitute 100 percent of

12  the strikes.  So I believe the defense has made out a

13  prima facie showing.  Actually it is seven, because the

14  alternate is also black.

15         So let me hear the government's explanation.

16  We'll start with 0286.  That's the juror in seat five.

17         MS. SISKIND:  Your Honor, this individual stated

18  that he works in the mental health field, including with

19  individuals who may have criminal records.  It is our

20  position that individuals in the mental health field tend

21  to be more sympathetic to defendants in criminal cases.

22  So for that reason, we used a strike on him.

23         MR. GARDNER:  Your Honor, we would challenge

1

1   that.  I don't see any background for that.  He doesn't

2   have any history of working with police officers, our

3   client doesn't have any criminal history.  It is just not

4   applicable to our client.  I would ask him to be seated.

5          THE COURT:  It is applicable to a criminal

6   defendant is the point.  I think that's a race neutral

7   reason.  There weren't others in the mental health field

8   who are white who weren't struck.  So I will uphold that

9   one.

10          The next juror is 0909.  That's the juror who is

11   now in seat one.

12          MS. SISKIND:  Your Honor, when this juror came

13   up, he expressed some confusion regarding some of the

14   questions.  And the government was concerned he might not

15   have understood some of the questions, and therefore

16   would not be able to understand the evidence at trial.

17          MR. GARDNER:  We would object to that one also.

18   He seemed crystal clear to me up here.  I would ask to go

19   back and listen to the tape before you make a judicial

20   finding that he expressed confusion up here.

21          THE COURT:  No, I remember that juror.  He did

22   express confusion initially.  Subsequently, he seemed

23   entirely clear.  But he indicated that -- both his facial

1   gestures -- and I remember his expression and his manner,

2   and what he said indicated some confusion.  I think

3   that's not as strong as the first but I think it does

4   pass muster.

5          MR. GARDNER:  Your Honor, I think the next step

6   is to go through all the rest of people who expressed

7   confusion coming up here and look at how many of those

8   who were not African-American or how many were not

9   stricken.

10         THE COURT:  So you tell me if there were white

11  jurors who expressed confusion in a similar way who were

12  not stricken.  I'm happy to hear you to show that it is

13  pretext.

14         MR. GARDNER:  If I could have Court's indulgence.

15         THE COURT:  Okay.

16         (There was a pause in the proceedings.)

17         MR. GARDNER:  Your Honor, I can't remember that

18  number right now.  But I remember one white, Caucasian

19  female who came up here and originally said that she

20  answered a question that she would not trust MPD officers

21  just based on their answer.  And then you clarified and

22  she said, Oh, it wasn't about their testimony, it was

23  about whether or not I knew them. That expressed that she

1   did not understand and had confusion about the questions.

2        THE COURT:  That's a different scenario.  This is

3   someone who initially, when brought up, expressed some

4   confusion.  So I don't think it is pretext.  Again, I

5   will see as these strikes continue.  But that is valid.

6   It is not pretextual.

7        The next one is 0743.  And that is juror number

8   two.

9        MS. SISKIND:  Your Honor, this was an individual

10  who seemed to have some problems with the English

11  language.  I think even explained to Your Honor his lack

12  of understanding of the questions.  He used the word

13  "mastery" and he was having trouble communicating to you

14  his lack of his understanding regarding the questions.

15  For that reason, we are concerned about his ability to

16  follow the evidence in this trial.

17        THE COURT:  Defense?

18        MR. McPHERSON:  Your Honor, to go from saying

19  that there is a language issue to the conclusion that he

20  is not going to understand a normal presentation,

21  conversation is a leap.

22        THE COURT:  The question is, hold on, the

23  question is not whether he could serve as a juror.  The

4

1   question is whether they have given a race neutral reason

2   for striking him is what I know.  What is your response

3   to that?

4            MR. McPHERSON:  That's not a race-neutral reason.

5            THE COURT:  Why not?  Of course, it is a race

6   neutral reason, there are many --

7            MR. McPHERSON:  It is.  But I don't think that it

8   is a valid reason that the Court should accept unless the

9   Court makes an additional finding that that perspective

10  juror cannot seem to understand what is being said to him

11  and what was being said --

12           THE COURT:  Again, this is not a cause strike.

13  This is a peremptory strike.  This is someone who is not

14  good with English, even if that doesn't mean they

15  wouldn't be able to understand the evidence, they're

16  allowed to strike that person for a race neutral reason.

17  If there was someone I didn't think could understand the

18  testimony, I would have excused that person for cause.

19           MR. McPHERSON:  I understand that they have to

20  proffer a race neutral reason for each person.  But as

21  they go along, when they're all of the same race, I think

22  the Court has to raise the bar in terms of the quality

23  and the applicability of the reason.

                                    5

 1          THE COURT:  But you are just saying that when, if

 2     it is a race question, I should raise the bar.  But it

 3     wouldn't be in front of me if it weren't a Batson

 4     question.

 5          MR. McPHERSON:  Actually I researched this issue

 6     for a Superior Court case that I tried in March.  And I

 7     have a post trial motion pending.  My understanding of

 8     the state law, D.C. law that I read was that the Court

 9     recognizes the greater the number of challenges that

10     appear to be on the issue of race, the greater the role

11     is of the judge in evaluating the race neutral assertions

12     by the party that made the strikes.

13          THE COURT:  I don't know, I'm not sure what the

14     law is in this jurisdiction as opposed to Superior Court.

15     But I am certainly going to, as we proceed, hold the

16     government to its burden on each one.

17          All right.  So the next is juror 0880 in seat 11.

18          MS. SISKIND:  Your Honor, this individual

19     indicated she had an uncle convicted in a narcotics case

20     and she believed that he had been treated unfairly by

21     either the police or the prosecution or both as part of

22     that case.  Particularly, to the extent any investigative

23     agent were called to testify in this case, the government

1    is concerned that she would take those biases from her

2    uncle's case and transfer them to this case and judge the

3    investigation, even though that is not what her job as a

4    juror would be.

5         MR. GARDNER:  That one I do believe is

6    pretextual.  Both sides have police officers that are

7    going to be called as witnesses.  It is a wash.

8         THE COURT:  The question is not -- the question

9    is whether there are white perspective jurors who didn't

10   believe the police.  The question is not which side this

11   juror might favor.  And I think the government has a

12   better of the argument anyway because someone who didn't

13   believe that their relative had received justice is much

14   more defense -- arguably more defense inclined, even

15   though the defendant is a police officer.

16        MR. GARDNER:  Your Honor, I disagree with that

17   premise.  I do think that as part of your determining it

18   is pretextual is a part of determining if the government

19   is using it for a non-racial reason that benefits its

20   side.  In this, this is not a benefit to them.  It's a

21   wash both ways.

22        THE COURT:  I don't think it is.  Clearly,

23   somebody in this kind of case would be more inclined to

1    favor the defense if they think their relative did not

2    get a fair trial, unless there was evidence that the

3    defendant himself were involved in not giving people fair

4    trials and we're not going to hear that.  I'll uphold

5    that one.

6           0041.

7           MS. SISKIND:  Your Honor, this individual

8    indicated she was audited three times.  And at least one

9    of those audits related to problems with a tax return

10   preparer.  Part of the government's evidence in this case

11   is two allegedly false returns were prepared by a tax

12   return preparer.  We believe that that can cause this

13   juror to bring in some biases regarding her experience

14   with mistakes made by a tax return preparer into the mix

15   here.  That would affect her judgment.

16          THE COURT:  Mr. Gardner?

17          MR. GARDNER:  I agree with that.

18          THE COURT:  1041, I think is the next one.  I'm

19   not sure.

20          MS. SISKIND:  Yes.

21          THE COURT:  That's the person in the gallery.

22          MS. SISKIND:  Your Honor, this was the individual

23   who just started a job two weeks ago.  She seemed to the

1   government to clearly not want to be here.  And the

2   government's concern is that that would cause her not to

3   take her responsibilities as a juror seriously.

4        MR. GARDNER:  Your Honor, we would ask for her to

5   be seated.  I mean, you explained to her up here that you

6   could write a note for her.  So that alleviates any

7   concerns the government has.  There were several people

8   who said I have to do this and that.  Your Honor, there

9   are several people who said they had other things to do.

10  You told them that they had to serve.

11       THE COURT:  Actually the three people that I told

12  that to, I then excused, and those were -- all three were

13  white women I excused ultimately for conflicts.  It is

14  certainly true given her attitude and body language and

15  facial expressions that she was someone not happy to be

16  here, I think more so than anybody else who was a

17  perspective juror.  Nobody else had just started a job.

18  I did excuse those other three women, all of whom were

19  white, as I said, for conflicts.  So I'll uphold that

20  strike.

21       The last one is the alternate strikes, 0857.

22       MS. SISKIND:  Your Honor, this is an individual

23  who stated that the father of her child is currently

9

1    incarcerated.  Depending on which witnesses are called

2    during this trial, it may come out that the defendant has

3    children.  And that if he is incarcerated, that could

4    have an impact on the mother of his children who, for

5    example, would not be getting child support.  The concern

6    would be that she might bring in some biases from that

7    family situation into the case here.

8         THE COURT:  All right.  So I don't think so.

9    This is a juror number -- okay.  So that's juror--the

10   first alternate?

11        MS. SISKIND:  Yes.

12        THE COURT:  You are saying that the father of her

13   children is incarcerated.  She did say that.

14        Defense?

15        MR. GARDNER:  Your Honor, I think that is very

16   attenuating.  She said she could be fair.  I mean, the

17   government had an opportunity to ask these witnesses

18   (sic) questions.  They chose not to ask any.  There is

19   nothing in the record that supports that.

20        THE COURT:  The question is are there jurors who

21   are similarly situated who are white who they didn't

22   strike.  And the answer is no.

23        MR. GARDNER:  There were other witnesses (sic)

1   who did say that they had family members, cousins,

2   whatever, locked up.  Presumably, those cousins had kids

3   that were related to them who would have the same

4   sympathies.  And the government didn't strike them.

5        THE COURT:  But the father of her children.

6        Again, Mr. McPherson's point I think is valid.  I

7   think any time you see a strike sheet that, even though

8   there are only seven, it is not 10 or 12 jurors, but any

9   time you see seven struck of one race, that raises

10  antennae.  And I think you're absolutely right to make a

11  Batson motion.  I understand that.  When I see that, I

12  attempt to and I require, just as the law makes me

13  require, the government to satisfy its burden that each

14  of these was valid.  And I believe that this is, this

15  juror was also in a unique situation.  There is no white

16  juror in a similar situation.

17       And I'm loathed to uphold all the strikes, given

18  that I see that they're all black jurors.  But the law

19  gives the government the opportunity to explain; as long

20  as it is a race neutral reason they're allowed to do so.

21  I believe they have cleared that burden and that you have

22  not shown in any way that they're pretextual.

23       MR. GARDNER:  Your Honor, we would ask for a new

1   jury panel.  The government has used all the strikes to

2   strike African-Americans.  You have ruled that it is not

3   a Batson problem.  But you still have control over the

4   fundamental fairness of this trial.

5        This is fundamentally unfair.  My client is a

6   African-American man.  The government has gotten rid of

7   all the black people on the jury.  We would ask for a new

8   jury pool so that we can have something representative of

9   this community which is majority African-American.

10       THE COURT:  As I said, the government has struck

11  half the qualified black jurors, not all.  And I'll also

12  state for the record what the final jury composition is,

13  but there is no reason to call for a new jury.  I don't

14  think it affects the fundamental fairness.  I'll deny

15  that motion.

16       MR. GARDNER:  Your Honor, we'll hold it in

17  abeyance until you see the final make-up of the seated

18  jury, if it is an all white jury.

19       THE COURT:  I'm happy to put the make up on the

20  record.  But I will deny the motion.  All right.

21       MR. GARDNER:  I think we still need to look at

22  each other's, I think I made the Batson challenge

23  before--

1          THE COURT:  That's why I let you look at each

2     other's.

3          MR. GARDNER:  Okay.

4          (Open Court)

5          THE COURT:  All right.  I'm going to have the

6     following jurors seated in the first two rows on my

7     right, if the gentleman on the second row could step out.

8     Thanks so much.

9          When I state your name if you could go all the

10    way into the first row, that would be great.  The

11    following jurors I'm going to have do that.

12          Juror 0054 in seat six;.

13          Juror 1493 in seat seven.

14          Juror 0286 in seat five.

15          Juror 0909 in seat one.

16          Juror 0331, who is in the gallery, I'm going to

17    have you move to the first row please.

18          Juror 0175, if you could move to the first row

19    also.

20          0020, if you could please.

21          0645, you can move to the second row there

22    please.

23          0075 also, second row.

1                0743 in seat number two, if you could move to the

2       second row.

3                0880 in seat 11, second row please.

4                0041 please, to the second row.

5                Juror 1041, second row please.

6                0857, if you could also move to the second row

7       please.   Thank you.

8                Counsel, approach for a moment.

9                (Bench conference).

10               THE COURT:  So the defense sheet has a few

11      problems here.  First of all, you've listed 0563 who was

12      already excused.  You've also listed her as black when

13      she is white.  You've also listed what apparently is an

14      "H" for Hispanic on one of the jurors who is white, who

15      you've struck.  And then you've also listed an alternate

16      as one of your regular strikes.

17               MR. GARDNER:  Can we move that to the alternate

18      then?

19               THE COURT:  I'm all right with you moving it to

20      the alternate strike since you hadn't listed one as the

21      alternate.

22               Any problems by the government?

23               MS. SISKIND:  No, Your Honor.

14

1          THE COURT:  So for the record, that would mean

2    that, of the nine strikes you have, two were of black

3    jurors and seven were of white jurors.  So that is on the

4    record.

5          MR. GARDNER:  If I could complete the record,

6    when I struck them I thought that one was

7    African-American and one was Hispanic as I noted on

8    there.

9          THE COURT:  But the one who was excused for her

10   vacation, you thought was black?

11         MR. GARDNER:  Obviously, I had confusion but I

12   did think she was black.  So I'll put it down, I think

13   that's more accurate.

14         THE COURT:  Thanks.

15         (Open Court)

16         THE COURT:  All right.  Juror 0957, if you could

17   also take a seat in that second row please.

18         Now if the following jurors could take the

19   following seats.  We're going to work from the first row.

20         Juror 0667 seat one.

21         Juror 1097 seat two.

22         Juror 0751 seat five.  I'm sorry.  Yes, seat

23   five.

                              15

1            Juror 1460 seat six.

2            Juror 1409 seat seven.

3            Juror 1109 seat nine.  That's the second row.

4            Juror 0079 seat 10.

5            Juror 0460 seat 11.

6            Juror 1171 seat 12.

7            Let me just have counsel approach again.

8            (Bench conference)

9            THE COURT:  Okay.  For the record we now, of the

10   regular jurors, three are black and nine are white.  Both

11   white -- I'm sorry, both alternates are white jurors.

12   That's just for the record.  So again, to the extent you

13   want to renew your motion to throw out this jury on

14   fundamental fairness grounds, I will deny it.   I think

15   that we have -- that the government's reasons were

16   upheld.

17            Obviously, it is the Court's duty to inquire

18   seriously about them since we don't want either side

19   striking them for the improper reasons.  I think I've

20   done that and the government has satisfied its burden.

21   So we will remain with this jury.  Anybody have any final

22   questions or issues regarding this jury?  Otherwise, I am

23   going to impanel them.

1          MS. SISKIND:  No, Your Honor.

2          MR. GARDNER:  The defense still has the same

3    objections as discussed but no new ones we haven't

4    discussed.

5          THE COURT:  All right.  Thanks.

6          (Open Court).

7          THE COURT:  Folks, this will be our jury here on

8    our left.  That means you folks will not be our jury.

9    But I want to thank you all very much for participating

10   in this procedure this morning.  So, all of you in the

11   gallery please take your belongings, return to the jury

12   office.  Tell them that you've been excused thanks so

13   much for your assistance.

14         (Remaining jurors out).

15

16